CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
July 02, 2024
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA

**MALAV THAKORE,**

        **Plaintiff,**

    **v.**

**SARAH WEBER,**

        **Defendant.**

**Case No.:** ___7:24cv00423___

**JURY DEMAND**

PLAINTIFF MALAV THAKORE, by his attorneys BINNALL LAW GROUP, and WARSHAW BURSTEIN, LLP, as and for his Complaint against Defendant SARAH WEBER, respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.    This defamation action is brought on behalf of Plaintiff Malav Thakore.

2.    As a result of the defamatory conduct by Defendant Sarah Weber, Plaintiff's reputation has been irreparably damaged, and Plaintiff has been subjected to severe emotional harm.

### THE PARTIES

3.    Plaintiff is a natural person residing in Virginia.

4.    Weber is a natural person residing in California.

### JURISDICTION AND VENUE

5.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Weber are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

1

6.      Plaintiff is a citizen of the Commonwealth of Virginia.

7.      Weber is currently a citizen of the State of California.

8.      At all times relevant to this litigation, Weber was a resident of the Commonwealth of Virginia who was a Doctoral Psychology Intern at the Virginia Polytechnic Institute and State University ("Virginia Tech").

9.      At all times relevant to this litigation, Weber was employed by Virginia Tech's Cook Counseling Center.

10.     This Court has personal jurisdiction over Weber because her defamatory conduct occurred in the Commonwealth of Virginia while she was a resident of the Commonwealth of Virginia and working as a Doctoral Psychology Intern/counselor at Cook Counseling Center at Virginia Tech.

11.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**FACTUAL ALLEGATIONS**

**Plaintiff's Relationship With Defendant**

12.     Weber worked as a Doctoral Psychology Intern/counselor at Virginia Tech's Cook Counseling Center in 2023.

13.     Plaintiff was Weber's patient from February 21, 2023 until July 3, 2023.

14.     Between February 21, 2023 and June 28, 2023, Plaintiff had eleven counseling sessions with Weber.

15.     Plaintiff and Weber began to develop a friendship that resulted in them having personal conversations after Plaintiff's therapy sessions ended.

16.     Some of these personal conversations lasted over an hour.

17.     After a therapy session on June 21, 2023, Plaintiff and Weber had a personal conversation that lasted more than 20 minutes.

18.     During the June 21, 2023 conversation, Weber told Plaintiff that her house was located on Virginia State Route 8 and showed Plaintiff the Google Street View of her house on Google Maps.

### The Events of July 1-2, 2023

19.     On the evening of July 1, 2023, Plaintiff drove from his residence to the Saddle Overlook on the Blue Ridge Parkway, arriving at approximately 7:25 PM.

20.     After staying at the Saddle Overlook for approximately 45 minutes, Plaintiff started to drive back home around 8:10 PM.

21.     In order to get home, Plaintiff needed to drive on Virginia State Route 8.

22.     At approximately 8:45 PM while he was driving home on Virginia State Route 8, Plaintiff saw Weber sitting outside of her house with her dog and stopped to say hello.

23.     Weber welcomed Plaintiff and invited him to stay.

24.     Plaintiff and Weber had a conversation in front of Weber's house for about 20 minutes.

25.     Weber was planning on leaving Virginia at the completion of her internship and was in the process of packing up her house in preparation for her move.

26.     At around 9:05 PM, Plaintiff stated that he should leave so that Weber could continue packing.

27.     In response, Weber told Plaintiff to stay and go on a walk with her and her dog.

28.     Plaintiff obliged, and he, Weber, and Weber's dog went for a walk.

29.     During the walk, Weber and Plaintiff had a friendly chat about Weber's family and her plans for the future.

30.     As the walk was coming to an end, Weber mentioned that she had some ice cream at her home that she and Plaintiff could share.

31.     Plaintiff and Weber arrived back at Weber's home around 9:55 PM.

32.     Plaintiff once again said that he should leave, but Weber once again told him to stay.

33.     Plaintiff and Weber sat in front of Weber's house and continued to talk.

34.     At one point, Weber went into her house to get ice cream for the pair while Plaintiff waited outside.

35.     Weber returned and she and Plaintiff ate ice cream together and continued to talk about deeply personal issues.

36.     Weber also showed Plaintiff photographs of her trips to national parks and her niece and nephew.

37.     Around 11:20 PM Weber went back into her house alone while Plaintiff waited outside.

38.     Weber returned to the outside of her house where Plaintiff was sitting about 10 minutes later.

39.     Around midnight, Plaintiff once again mentioned leaving, but Weber once again encouraged him to stay and continue talking.

40.     Weber and Plaintiff began talking about stargazing and discussed going to the Saddle Overlook to look at the night sky.

41.     During this conversation, Plaintiff again noted that he should probably go home,

but Weber once again told him to stay.

42.     Weber also said that they should go to Saddle Overlook that night and told Plaintiff that she had something that she wanted to talk to him about.

43.     Weber told Plaintiff that he should drive them to Saddle Overlook.

44.     Around 1:15 AM on July 2, 2023, Weber willingly got into Plaintiff's car and the pair began driving to Saddle Overlook.

45.     During the conversations in front of her house from 9:55 PM to 1:15 AM, Weber had been flirting with Plaintiff and touching his legs, hands, and arms.

46.     Plaintiff and Weber continued to talk as they drove from her house to Saddle Overlook.

47.     During the drive, Weber told Plaintiff that she wanted to ask him something, and Plaintiff said that she could do so when they reached Saddle Overlook.

48.     Plaintiff and Weber reached Saddle Overlook around 1:55 AM on July 2, 2023.

49.     They got out of the car, but it was colder than expected.

50.     Because Weber was wearing shorts, Plaintiff suggested that they get back inside his car, and Weber agreed.

51.     Once they were back in the car, Weber asked Plaintiff, "Do you like me?"

52.     Plaintiff answered affirmatively.

53.     Weber then told Plaintiff that she liked him as well and that he had been constantly on her mind on weekend nights over the past few weeks.

54.     Weber told Plaintiff that over the past few weeks she could not stop thinking about him even when she actively tried not to.

55.     Weber told Plaintiff that she began falling for him during one of their counseling

sessions.

56.     Weber told Plaintiff that over the past few weeks, she laughed more often when he was in her office for counseling sessions, but when he left her office it felt like everything was gone.

57.     Plaintiff and Weber continued to talk about their feelings deep into the night and early morning.

58.     Around 4:20 AM on July 2, 2023, Weber grabbed Plaintiff's hand and kissed him on the lips.

59.     Weber's decision to kiss him shocked Plaintiff.

60.     Weber immediately acknowledged that what she did was wrong because Plaintiff was her counseling patient.

61.     Despite this acknowledgment, Weber started kissing Plaintiff again.

62.     Weber then suggested that they move from the front seat of Plaintiff's car to the back seat because it would be "better" in the back seat.

63.     Eventually, Weber and Plaintiff moved to the back seat of Plaintiff's car.

64.     Weber and Plaintiff continued to consensually kiss in the back seat of his car for 10 to 15 minutes.

65.     During this consensual kissing, Weber pulled her top up and asked Plaintiff to open her bra.

66.     Plaintiff did as Weber requested, and, once her bra was off, Weber told Plaintiff to kiss and suck on her breasts.

67.     Weber then pushed Plaintiff's head into her breasts and held it there for a while.

68.     Plaintiff did not initiate any of the physical contact that occurred him his car.

69.    At all times, Weber was the one initiating sexual activity.

70.    All of the activity that Weber and Plaintiff engaged in was consensual.

71.    After Weber had pushed his head into her breasts for several minutes, Plaintiff got up and asked Weber if they could leave Saddle Overlook.

72.    At that point, it was 4:55 AM on the morning of July 2, 2023, and Plaintiff suggested that they should go back to Weber's house to discuss what happened in light of her comment that she should report their interaction.

73.    Weber agreed that they should go back to her house to discuss the situation.

74.    The pair left Saddle Overlook around 5:05 AM on the morning of July 2, 2023.

75.    On the ride back to her house, Weber fell asleep in the back seat of Plaintiff's car.

76.    Plaintiff and Weber arrived at Weber's house at approximately 5:35 AM.

77.    Weber woke up when Plaintiff turned the engine of his car off.

78.    Plaintiff and Weber entered Weber's house, and Weber locked the door behind them.

79.    Weber asked Plaintiff if he wanted anything to eat or drink, but Plaintiff declined the offer.

80.    Weber went to an inner room of her home before returning in a panicked state and asking Plaintiff to come with her to multiple bedrooms in her home before abruptly asking him to leave.

81.    When Plaintiff asked what was going on, Weber started crying and went into the fetal position on the floor.

82.    While she was on the floor, Weber continued to cry and lamented that her name would be published in a news story detailing her inappropriate interaction with a patient, namely

Plaintiff.

83.     Weber said that she did not know what to do because she could not live with the

shame and embarrassment of people knowing that she had a sexual encounter with a patient.

84.     Weber continued crying for 15 to 20 minutes while Plaintiff tried to console her.

85.     Weber eventually got off the floor and went to her living room to sit on the sofa.

86.     Weber and Plaintiff then had a conversation from around 6:10 AM until 8:25 AM.

87.     Weber told Plaintiff that she would be judged for having a sexual encounter with a

patient and that her career as a counselor would be over.

88.     Weber said that she would be fired and lose her license if anyone found out about

her encounter with Plaintiff.

89.     Plaintiff said he had no intention of reporting Weber's misbehavior and offered to

stop going to Cook Counseling Center in order to protect her.

90.     Weber agreed with this plan and said that she would lie to her supervisor about the

circumstances surrounding Plaintiff's decision to stop treatment with her.

91.     Weber then told Plaintiff that she would not be able to see him anymore even

though she really wanted to.

92.     Weber then changed tack and indicated that she wanted to be with Plaintiff.

93.     Plaintiff told Weber that they could not be together because it would endanger her

career.

94.     After hearing this, Weber became very sad and started crying again.

95.     Around 8:15 AM Weber said she had to go to sleep so that she could wake up to

go to church in a few hours.

96.     Plaintiff left Weber's home and arrived at his residence around 8:50 AM.

97.     Weber had made some bizarre statements and was acting strangely before Plaintiff left her home on the morning of July 2, 2023.

98.     As a result, Plaintiff went back to Weber's home to check on her in the afternoon.

99.     Plaintiff arrived at Weber's home around 3:10 PM on the afternoon of July 2, 2023.

100.    Upon his arrival, Plaintiff observed Weber acting very weirdly and speaking incoherently.

101.    Weber told Plaintiff that she could go to prison as a result of their romantic encounter.

102.    She then started crying and said that she had an abusive childhood and had been through a lot of trauma in her life.

103.    Referring to their romantic encounter, Weber told Plaintiff that she made a mistake and wished it never happened.

104.    Weber said that she could be "screwed" if Plaintiff told anyone at Cook Counseling Center about their romantic encounter.

105.    Weber calmed down a bit and then suddenly became panicked and angry.

106.    In a rage, she told Plaintiff that she should have never talked to him and that she was going to hurt him either way.

107.    Plaintiff left Weber's home around 4:15 PM.

**The Events of July 3-5, 2023**

108.    On July 3, 2023, as part of the plan he and Weber developed, Plaintiff sent an email to the Cook Counseling Center explaining that he needed to cancel his upcoming sessions with Weber due to personal reasons.

109.    On the evening of July 3, 2023, Plaintiff contacted the on-call crisis counselor at

Cook Counseling Center and provided a vague description of his interaction with Weber without using her name.

110.   The next day, Plaintiff contacted the on-call crisis counselor again to discuss his interaction with Weber.

111.   Like his previous discussion, Plaintiff did not identify Weber or provide much detail regarding their encounter during his July 4, 2023 call with the crisis counselor.

112.   On July 5, 2023, Plaintiff received an email with a letter from the director of Cook Counseling Center.

113.   The letter from the director stated that Plaintiff could not continue his therapy with Weber as a result of Plaintiff's actions on the afternoon of July 2, 2023.

114.   The letter from the director was based on false statements that Weber made to her supervisor.

**Weber's Defamatory Conduct**

115.   On July 2, 2023 in the mid-to-late-afternoon, Weber falsely told her mother, Julie Freistat, that Plaintiff physically forced himself on her during their encounter on July 1-2, 2023.

116.   Specifically, Weber falsely told her mother that Plaintiff "physically forced" her to have "physical contact" with him.

117.   Weber falsely told her mother that Plaintiff threatened to push her into the road and pull her hair.

118.   Specifically, Weber falsely told her mother, "Malav made comments about pushing me into the road and pulling my hair."

119.   Weber falsely told her mother that Plaintiff remained at her home for an extended period of time and refused to leave.

120.    Specifically, Weber falsely told her mother, "Malav stayed at the door and would not leave for an extended period of time."

121.    Weber falsely told her mother that Plaintiff's behavior caused her to become so panicked that she was balled up on the floor demanding that Plaintiff leave her home.

122.    Specifically, Weber falsely told her mother, "I was so panicked that I was on the ground balled up and saying 'Please go,' to Malav."

123.    On July 2, 2023 around 5:30 PM, Weber called her supervisor at Cook Counseling Center and falsely stated that Plaintiff came to her house that afternoon, expressed romantic feelings for her, and refused to leave when she asked him to leave.

124.    Specifically, Weber falsely stated, "Malav Thakore showed up at my residence on July 2 in the afternoon and expressed romantic feelings towards me and embraced me."

125.    Weber also falsely stated, that she "asked Malav to leave several times but he refused."

126.    In her call with her supervisor, Weber falsely asserted that Plaintiff followed her into her house and followed her from room to room inside the house repeatedly stating his romantic feelings for her.

127.    Specifically, Weber falsely stated, "I attempted to retreat to my home and Malav followed me indoors and I repeatedly told him he needed to leave."

128.    During the week of July 3, 2023, Weber made many additional false statements about her consensual romantic encounter with Plaintiff.

129.    During the week of July 3, 2023, Weber falsely told Ashley Dominquez that Plaintiff showed up to her house on July 1, 2023 and would not leave after she told him multiple times to leave.

130.    Specifically, Weber falsely told Dominquez, "Malav showed up to my house and would not leave after I told him multiple times to leave."

131.    Weber also falsely told Dominquez that she tried to kick Plaintiff out of her house but that Plaintiff would not leave.

132.    Specifically, Weber falsely stated, "I tried to kick him out, but Malav kept not leaving."

133.    Weber falsely told Dominquez that Plaintiff forced her into his car on the night of July 1-2, 2023 and made her go for a ride.

134.    Specifically, Weber falsely told Dominquez, "Malav forced me, I had no choice but to get in his car for a ride."

135.    Weber falsely told Dominquez that after the car ride, Plaintiff followed her into the house, followed her from room to room, and refused to leave for several hours even though Weber wanted to go to sleep and was scared.

136.    Specifically, Weber falsely told Dominquez, "When we came back Malav followed me into the house.  I just wanted to go to bed but was scared because Malav would not leave. Malav followed me from room to room in the house and was there for a few hours."

137.    Weber also falsely told Dominquez that she needed to strike Plaintiff to prevent him from touching her.

138.    Specifically, Weber falsely told Dominquez, "I swatted at Malav to try to stop physical contact."

139.    During the week of July 3, 2023, Weber falsely told her sister, Amanda Weber, that Plaintiff tried to force himself on her multiple times during the evening of July 1-2, 2023.

140.    Specifically, Weber falsely told her sister, "Malav attempted to force himself on

12

me multiple times."

141.     Weber also falsely told her sister that Plaintiff was following her around her house with his hands on her.

142.     Specifically, Weber falsely stated to her sister, "Malav was following me around the house with his hands on me."

143.     Weber falsely told her sister that at one point she fell to the floor to try to avoid being touched by Plaintiff and that while she was on the floor Plaintiff prevented her from moving by putting his body weight on her.

144.     Specifically, Weber falsely told her sister, "I fell to the floor trying to avoid being touched by Malav, and that while I was on the floor, Malav was blocking me from moving with his body."

145.     Weber falsely told her sister that she initially refused to go on a car ride with Plaintiff but was forced to do so because Plaintiff refused to leave her house.

146.     Specifically, Weber falsely told her sister that she said, "No" to Plaintiff's suggestion to go on a car ride and that Plaintiff "wouldn't leave" unless she went on a car ride with him.

147.     Weber falsely told her sister that Plaintiff was the one who first brought up romantic feelings in his car.

148.     Weber falsely told her sister that Plaintiff tried to grope her in his car.

149.     Specifically, Weber falsely told her sister, "Malav had me in the car driving me around and was trying to convince me that our relationship was not strictly professional, and beyond that he was trying to grope me in the car."

150.     During the week of July 3, 2023, Weber falsely told Andrew Facemire that Plaintiff

came to her house on July 1, 2023 to express his romantic feelings towards her and share his dismay that she was leaving her internship.

151.    Specifically, Weber falsely told Facemire, "When Malav arrived, he said he needed to talk to me and express his feelings.  He was distressed because I was leaving my internship soon.  Malav was expressing to me that he had romantic feelings for me and that he and I were meant to be together."

152.    Weber falsely told Facemire that Plaintiff referenced his religion to explain why he believed he and Plaintiff should be together.

153.    Specifically, Weber falsely stated, "Malav is Hindu and he was making religious comments about how we were meant to be together and referencing his religion in his level of romanticizing a relationship with me."

154.    Weber falsely told Facemire that Plaintiff stayed at her home for several hours even though she repeatedly told him to leave.

155.    Specifically, Weber falsely told Facemire, "Malav stayed at my home for a significant length of time and refused to leave despite me telling him multiple times to go."

156.    Weber falsely told Facemire that Plaintiff menaced her and made her feel uncomfortable by saying, "If I wanted to shove you into the road, I could," while they were taking a walk.

157.    Weber falsely told Facemire that Plaintiff "was very insistent" that she go for a car ride with him and that she "was feeling threatened" by Plaintiff's requests.

158.    Weber falsely told Facemire that she was "terrified" and "worried about her safety" during her encounter with Plaintiff on July 1-2, 2023.

159.    On or about July 17, 2023, Plaintiff told Celeste Wilcox that Plaintiff sexually

assaulted her.

160.    Specifically, Weber falsely told Wilcox, "Malav Thakore sexually assaulted me."

**Plaintiff Has Been Severely Damaged By Weber's Defamatory Conduct**

161.    Plaintiff's reputation has been severely damaged as a result of Weber's defamatory conduct.

162.    Plaintiff has also suffered severe emotional distress as a result of Weber's defamatory conduct.

## FIRST CAUSE OF ACTION
### (DEFAMATION)

163.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

164.    As detailed extensively above, Weber made false statements regarding Plaintiff's conduct to multiple individuals over a multi-week period of time.

165.    Weber falsely asserted that Plaintiff stalked her, threatened her, aggressively pursued her, refused to leave her home when asked, and sexually assaulted her.

166.    Weber knew the statements she made regarding Plaintiff were false.

167.    In reality, Weber encouraged Plaintiff to stay at her home for hours and felt so comfortable around him that she asked him to go on a walk with her and willingly got into his car to drive to a secluded location.

168.    Once she was alone with Plaintiff in a secluded location, Weber expressed her romantic feelings towards Plaintiff and became sexually aggressive.

169.    Weber's sexual aggression culminated in her forcing Plaintiff's face into her bare breasts in the back seat of Plaintiff's car.

170.    Weber made the false statements about Plaintiff detailed above in order to protect

her professional future.

171.    As a therapist, Weber knew that she could not have sexual contact with a patient.

172.    Despite this knowledge, Weber pursued Plaintiff and engaged in a consensual sexual encounter with him.

173.    Realizing that her actions put her professional future in jeopardy, Weber concocted a false narrative that portrayed Plaintiff as the aggressor.

174.    Indeed, Weber told Plaintiff that she would get fired, lose her license, and become the subject of public shame and ridicule if anyone found out that she engaged in a sexual encounter with a patient.

175.    Weber even told Plaintiff that it was possible that she would go to jail as a result of her inappropriate behavior.

176.    In order to avoid the consequences of her unseemly actions, Weber decided to make repeated false statements about Plaintiff to smear him as a threatening and possessive sexual deviant.

177.    As a result of Weber's false statements, Plaintiff's reputation was severely damaged.

178.    As a result of Weber's false statements, Plaintiff suffered severe emotional distress.

179.    Because Weber's statements were made with actual malice, Plaintiff is entitled to punitive damages in addition to the general damages stated above.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendant as follows:

(i)    on the first cause of action for defamation, a judgment against Defendant Sarah Weber awarding Plaintiff damages in an amount to be determined at trial, including,

without limitation, damages to reputation, emotional and psychological damages, and punitive damages, plus prejudgment interest, expenses, costs, and disbursements; and

(ii)     awarding Plaintiff such other and further relief as the Court deems just, equitable, and proper.

Dated: Alexandria, Virginia
       July 2, 2024

**BINNALL LAW GROUP**
*Attorneys for Plaintiff*

By: */s/ Benjamin North*
       Benjamin North
       717 King Street, Suite 200
       Alexandria, VA 22314
       (703) 888-1943
       ben@binnall.com

*-and-*

**WARSHAW BURSTEIN, LLP**
*Attorneys for Plaintiff*
       Kimberly C. Lau (*pro hac vice*
       motion forthcoming)
       James E. Figliozzi (*pro hac vice*
       motion forthcoming)
       575 Lexington Avenue
       New York, New York 10022
       (212) 984-7700
       klau@wbny.com
       jfigliozzi@wbny.com